# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### (Chicago Division)

ASLI BAZ        *

     Petitioner,      *

                              **Civil No.: 1:23-cv-05017**

v.                             *

ANTHONY PATTERSON      *

     Respondent.      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

[SPACE INTENTIONALLY LEFT BLANK]

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I. INTRODUCTION ...................................................................................................... 1

II. PROPOSED FINDINGS OF FACT ........................................................................... 1

    A.   Factual Findings ................................................................................................ 1

    B.   The Child's Habitual Residence Is Germany ........................................................ 10

III. PROPOSED CONCLUSIONS OF LAW ..................................................................... 12

    A.   Hague Convention Standards ................................................................................ 12

    B.   The Date of Retention ......................................................................................... 14

    C.   The Child's Habitual Residence Was Germany on the Date of Retention ................. 17

    D.   Rights of Custody to the Child Under German Law .................................................. 21

    E.   Exercising Rights of Custody ................................................................................ 23

    F.   None of the Convention's Narrow Discretionary Exceptions to Return Applies ........ 23

IV. CONCLUSION ........................................................................................................ 24

CERTIFICATE OF SERVICE ........................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Abbott*, 560 U.S. 1 (2010) ...........................................................12

*Abou-Haidar v. Sanin Vazquez,* 945 F.3d 1208 (D.C. Cir. 2019) ..............14, 15, 16, 17

*Blackledge v. Blackledge,* 866 F.3d 169 (3rd Cir. 2017) ..............................14

*Chafin v. Chafin*, 568 U.S. 165 (2013) .....................................................12

*Davis v. Combs,* 294 F.3d 931 (7th Cir. 2002) ...........................................24

*Hernandez v. Cardoso,* 844 F.3d 692 (7th Cir. 2016) ..................................12

*In re Myers,* 616 F.3d 626 (7th Cir. 2010) ................................................24

*Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) ....................................12, 13

*Marks ex rel. S.M. v. Hochhauser,* 876 F.3d 416 (2nd Cir. 2017) ................14

*Martinez v. Cahue,* 826 F.3d 983 (7th Cir. 2016) .......................................12

*Monasky v. Taglieri*, 140 S.Ct. 719 (2020) ....................................11, 17, 18

*Norinder v. Fuentes,* 657 F.3d 526 (7th Cir. 2011) ....................................24

*Palencia v. Perez,* 921 F.3d 1333 (11th Cir. 2019) ....................................14

*Redmond v. Redmond,* 724 F.3d 729 (7th Cir. 2013) ...................14, 15, 16, 18

*Sealed Appellant v. Sealed Appellee*, 394 F.3d 338 (5th Cir. 2004) ............23

*Walker v. Walker,* 701 F.3d 1110 (7th Cir. 2012) ...........................12, 13, 19, 20

*Whallon v. Lynn, 230* F.3d 450 (1st Cir. 2000) .........................................22

## Treaties

The Convention on the Civil Aspects of International Child Abduction,
Done at the Hague, October 25, 1980, T.I.A.S. No. 11,670,
1343 U.N.T.S. 89 ................................................................................................................... *passim*

## Statutes & Rules

International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.*............................... *passim*

Fed. R. Civ. P. 44.1.....................................................................................................................22

## Other Authorities

United States Department of State Legal Analysis 51 Fed. Reg. 10494 .......................................19

Petitioner, Asli Baz (the "Mother"), by and through her undersigned attorneys, and in accordance with the Court's Pretrial Order, files her Proposed Findings of Fact and Conclusions of Law, and states as follows:

## I.     INTRODUCTION

1.      This matter is a straightforward and textbook Hague Convention case. The child lives in Germany with the Mother in accordance both with a 2023 German Consent Order and a 2022 Illinois Relocation Order. The Father retained the child in Illinois during the child's summer vacation visit with the Father, in breach of the Mother's German "rights of custody" under the 2023 German Consent Order. None of the Convention's discretionary exceptions to return applies. The child shall therefore be returned to Germany forthwith.

## II.    PROPOSED FINDINGS OF FACT

### A.     Factual Findings.

2.      The child at issue here is the parties' son AP who was born in 2017 (the "child"). The Mother and Father met in Miami while the Mother was visiting Florida with friends. They began a relationship with each other in approximately 2013. At that time, the Mother lived in the United Kingdom and the Father lived in Miami.

3.      The Mother moved to Chicago on a student visa in 2015 to pursue her doctoral degree in clinical psychology at Roosevelt University. The Mother and Father then moved in together in Chicago. The parties are not now and never have been married to each other.

4.      All throughout the parties' relationship, the Father has engaged in abuse against the Mother. After the child's birth in 2017, the Father escalated his abuse to physical abuse. The parties separated shortly thereafter, and in accordance with an Illinois state court custody order, the Mother lived on the first and second floors of their home with the child, and the Father lived in the

basement and was not permitted to enter the rest of the home except in certain limited circumstances. Pet. Ex. 8 at AB000102.

5.      On November 24, 2017, the Father committed a domestic battery against the Mother. Pet. Ex. 8 at AB000103-104. The Father entered the child's nursery, grabbed the Mother, threw her to the ground, put her in a chokehold, and threatened to kill the Mother. *Id*. The Mother fought off the Father and he eventually released the Mother and ran to the basement. *Id*.

6.      The local police had already been to the home that day approximately 20 minutes before the Father attacked the Mother. *Id*. The Mother had called the police to seek assistance because she discovered the Father upstairs in her home removing doors to the property, in violation of the order. *Id*. When the Mother discovered the Father he came towards her in a threatening manner and she pepper-sprayed him to defend herself. *Id*.

7.      The Mother called the police again after the Father attacked her. *Id*. The same police officer attended at the home and arrested the Father. *Id*.  The Mother obtained a domestic violence order of protection. *Id*.

8.      The Father was charged with and later convicted of domestic battery for the November 24, 2017 attack. *Id*. He was sentenced to 18 months of conditional discharge, which included a requirement that he complete domestic violence classes. Pet. Ex. 8 at AB000106-110. The Father attempted to challenge his conviction by filing a motion for retrial claiming ineffective assistance of counsel. *Id*. The court denied the Father's motion. *Id*. The Father appealed his conviction to the Appellate Court of Illinois, First District. *Id*. The appellate court affirmed the lower court's conviction of the Father. *Id*.

9.      Litigation between the parties relating to AP continued over the course of the next several years in the Illinois state court. On August 5, 2019, the Illinois state court entered an order

permitting the Mother to relocate with the child to Wisconsin for her mandatory pre-doctoral internship. Resp. Ex. 5. On September 2, 2020, the Illinois state court entered an order permitting the Mother to relocate with the child to Minnesota for her mandatory post-doctoral fellowship in forensic psychology. Resp. Ex. 8.

10.     The Mother had finished her post-doctoral fellowship in 2021, and she had received a 6-month extension of her student visa from the United States government because of the COVID-19 pandemic. Her immigration status in the United States under her student visa was therefore to expire in May 2022 at the conclusion of her visa extension. The Mother attempted to obtain employment and a new non-immigrant visa that would allow her to remain in the United States. She made numerous efforts and applications, none of which were successful. In anticipation of her visa expiring, the Mother filed a motion in the Illinois state court seeking permission to relocate with the child to Germany, because she would be unable to continue to live in the United States beyond May 2022. Resp. Ex. 9. The Father opposed the Mother's motion.

11.     The Illinois state court held a trial on the Mother's relocation motion. On May 9, 2023, the court granted permission for the Mother to relocate to Germany, which was followed by a written order entered on May 12, 2022. Resp. Ex. 13. It instructed the parties' respective counsel to draft an agreed-upon order containing the details of parenting time and significant decision-making responsibilities in light of the court's decision to permit the relocation. After the Illinois state court gave its ruling on the relocation and instructions for drafting the proposed order, it held two further hearings, on May 11 and 17, 2022 respectively, to address the summer 2022 schedule for the child and certain financial aspects of the relocation. The Mother was permitted to relocate with the child to Germany while the parties' respective counsel finalized the proposed consent order. *Id*.

12.     On May 23, 2022, the Illinois state court entered the parties' proposed order on relocation, parenting time, and significant decision-making responsibilities as an "Allocation Judgment: Allocation of Parental Responsibilities and Parenting Plan" (the "2022 Relocation Order"). Pet. Ex. 7. In the 2022 Relocation Order, the parties agreed, and the Illinois state court ordered, *inter alia*: (A) the Mother was permitted to relocate with the child to Germany; (B) the child would live with the Mother; (C) the Father would have parenting time with the child on a specific schedule during the child's summer, autumn, winter, spring and holiday breaks from school; (D) the exact dates of the Father's parenting time during all such breaks are subject to change each year based upon the child's school schedule; (E) the parents may modify the 2022 Relocation Order's parenting time schedule by written agreement; and (F) the parents may agree to vary the terms of the 2022 Relocation Order. *Id.*

13.     The 2022 Relocation Order contains a mandatory mediation clause that requires the parties to attempt to resolve any disputes relating to the 2022 Relocation Order through settlement negotiations and mediation. *Id.* at ¶ 7.06. The 2022 Relocation Order requires that the parent exercising parenting time with the child shall maintain physical possession of the child's passport during their parenting time, and that the parties shall exchange the child's passport when they exchange the child for parenting time. *Id.* at ¶ 3.05(D). The 2022 Relocation Order further provides that "[i]f the parties fail to exchange the minor child's passport as required, airport police can enforce this order to ensure the passport's return." *Id.* The 2022 Relocation Order further provides the mechanism the parties must follow in the event the Mother seeks to relocate the child *from* Dusseldorf, Germany to any other place in the future. *Id.* at ¶ 5.01.

14.     The 2022 Relocation Order is not temporary. Pet. Ex. 7. There is no indication anywhere in the 2022 Relocation Order that the child's relocation to Germany with the Mother

was anything other than indefinite. *Id.* There is no termination or expiration date in the 2022 Relocation Order to the child living in Germany with the Mother. It provides that the child will attend school in Germany. And it contains detailed provisions relating to an agreed procedure for any prospective future relocations *from* Germany. *Id.* at ¶ 5.01. The Father's trial testimony that the relocation to Germany was intended by the 2022 Relocation Order to be temporary is not credible. Nor is the same testimony of the state court guardian ad litem, who appeared voluntarily to testify in the Father's case at the Hague Convention trial. Both the Father and the state court guardian ad litem testified that the Mother was required under the 2022 Relocation Order to continue making efforts to obtain immigration status that would permit her to live in the United States, and to move back to the United States when such status was obtained. The 2022 Relocation Order contains no such provision. Rather, the only reference to the Mother's visa status in the 2022 Relocation Order is contained in paragraph 3.01(G) – which relates to transportation of the child to and from the United States for visitation with the Father. It merely provides that the Mother should continue to try to obtain visa status that enables her to travel to and from the United States; not that the Mother obtain immigration status to live in the United States or that she move back to the United States. *Id.* at ¶ 3.01(G). The Mother testified at trial that she has not been successful in obtaining any visa, other than entering the United States under the ESTA visa waiver program to attend the trial in this case.

15.     The 2022 Relocation Order contains a statement that the child's Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") "home state" and Hague Convention habitual residence is Illinois. Pet. Ex. 7 at Art. VI, p. 19-20. The Mother agreed in her trial testimony before this Court that the child's home state and habitual residence at the time the 2022 Relocation Order was entered was indeed Illinois. But the child's habitual residence in early May

2022 is not dispositive of habitual residence in this Hague Convention case in 2023. Rather, the Court must consider the totality of the child's circumstances as of the date of retention in 2023. *See* Section II (B), (C) *infra*.

16.     In accordance with the Illinois state court's ruling, which was followed by the 2022 Relocation Order, the Mother and child relocated to Germany on or about May 13, 2022.

17.     The child attends school in Germany. Pet. Exs. 9-11.  He attended the International School on the Rhine ("ISR") in Dusseldorf for kindergarten from August 2022 until December 2022. But the Father failed to pay his share of the child's ISR tuition as required by the 2022 Relocation Order. The Mother could not afford to pay the ISR tuition herself. She therefore had no alternative but to enroll the child in a different school, close to the child's home in Germany, to complete kindergarten. The child attended kindergarten in Germany from January 2023 until July 2023, at the Johanniter Kindergarten in Erkrath, Germany, where the Mother and child live. The child is enrolled and was scheduled to begin first grade in Germany on August 8, 2023 at the Regenbogen Grundschule Primary School in Erkrath, Germany. He has already missed nearly all of the first school term in Germany.

18.     The child receives routine medical care, mental health care, and dental care in Germany. Pet. Exs. 25-28. The child participates in extracurricular activities, playdates, and cultural activities in Germany and all such activities are conducted in German with the child. Pet. Ex. 29. The child speaks fluent German.

19.     Indeed, the Father's sister Philtrina Farquharson testified at the evidentiary hearing that she had visited the child in Germany, inspected his German school materials, visited his school, and even took the child to hospital in Germany when he became ill during their visit.

20.     The child has extended family and friends in Germany. The child is fully involved and integrated in all aspects of daily and cultural life in Germany. The child is fluent in German, Turkish, and English. The Mother is fully involved in all of the child's schooling, medical care, mental health care, dental care, and other activities in Germany. The Mother provides all of the child's day-to-day care in Germany.

21.     At the conclusion of the Father's parenting time with the child on January 5, 2023, he refused to return the child's United States passport to the Mother as required by the 2022 Relocation Order. The Father refused to tell the Mother why he would not return the passport as required by the 2022 Relocation Order, and instead threatened the Mother that she would "find out" why he refused to return it as required.

22.     As contemplated and authorized by the 2022 Relocation Order, the Mother sought the assistance of the German police to obtain the child's United States passport from the Father in accordance with the 2022 Relocation Order. The Father continued to refuse to return the child's United States passport to the Mother. The Mother believed at the time that the Father kept the passport so that he could take the child from Germany and retain him in the United States.

23.     The Mother therefore sought the assistance of the German justice system in resolving the passport issue, given that her efforts to resolve the passport issue directly with the Father and then through the German local police had not been successful. She filed a case in Germany seeking to address the passport issue by seeking an order preventing the child from being removed from Germany and seeking a custody order in the German court. The German court entered initial interim orders prohibiting the removal of the child from Germany during the pendency of the German proceeding, all of which were the result of the Father refusing to return the passport. The Father then engaged fully and voluntarily in the German proceedings. He

retained counsel in Germany and was represented by counsel at all stages of the German proceedings.

24. On May 31, 2023, the parties engaged in settlement negotiations in the proceedings pending in the German court. Pet. Ex. 1, 2, 4. The German proceedings and settlement negotiations were initiated as a result of the Father having refused to provide the child's passport to the Mother in January 2023 as required by the 2022 Illinois relocation order. *Id.* At a hearing scheduled in the German case on May 31, 2023, the parties each appeared (the Father appeared by video) and were each represented by German counsel. Pet. Ex. 4. The German Youth Welfare Office worker attended the hearing. *Id.* The German Court provided a certified English-German interpreter for the Father. *Id.* At the appearance before the German Court, the parties through their respective counsel reached an agreement with respect to the child's living arrangements and schedule. *Id.* The parties and their respective counsel engaged in settlement negotiations over a four-hour time period at the German Court appearance. *Id.* In reaching their agreement, the parties each had the opportunity to speak privately with their respective counsel all throughout the day.

25. The Mother and Father agreed that the child would continue to live in Germany with the Mother. *Id.* They further agreed that for the summer holidays of 2023, the child would visit with the Father in Illinois and would return home to Germany on July 31, 2023, in time to begin the new school year on August 8, 2023. *Id.* And they agreed that the Father's case pending in the Illinois state court would be stayed. *Id.* The parties entered their agreement as a Consent Order in the German court that day, after it had been read in open court, and translated into English in open court, numerous times by the German judge and interpreter. *Id.*

26. Almost immediately after entry of the German Consent Order, the Father began taking steps to retain the child in Illinois by attempting to "reassert custody rights" in the Illinois

state court through the filing of various pleadings and papers seeking sole custody of the child. By way of example, on June 1, 2023, the Father filed his "German Settlement Notice" in the Illinois state court. Resp. Ex. 18. The Father's notice contained only an incomplete translation of the German Consent Order. *Id.*; *see also* Pet. Ex. 4 (complete translation and original German Consent Order). It did not contain the original German Consent Order, and it did not advise the Illinois state court that the German Settlement was in fact a Consent Order entered by the German Court. *Id.*

27. The Father then immediately claimed he had been duped into entering the German Consent Order under duress. He made these claims as early as June 2, 2023 to the state court guardian ad litem, Mr. Bender, according to Mr. Bender's testimony before this Court. The Court does not find the Father's testimony that he was "under duress" at the time of entering into the German Consent Order to be credible. *See* ¶¶ 24, 25 *supra*.

28. The Father then took the child from his kindergarten in Germany to Illinois on or about July 3, 2023. Just a few days after the Father arrived in Illinois with the child, he unilaterally filed for sole custody in the Illinois state court. It is uncontroverted based on the parties' trial testimony and exhibits that all throughout June and July of 2023, the Father sought sole custody and injunctive relief through various unilateral filings in the Illinois state court all in contravention of the Germany Custody Order. *See, e.g.* Resp. Ex. 34 at pp. 12-22. By July 18, 2023, the Mother understood, based on the Father's express statements in the Illinois state court proceeding, that the Father would not return the child to Germany. Pet. Ex. 12.

29. The Mother, through her German counsel Dr. Andreas Hanke, notified the German court that the Father had not complied with the terms of the German Consent Order, in that he was continuing to pursue his litigation in Illinois and was challenging the German consent order in

Illinois. Pet. Ex. 3. The Mother therefore did not send the child to Illinois on June 19, 2023 for the Father's summer 2023 parenting time because the Father had by that time made clear that he did not intend to return the child to Germany. The Mother anticipated that the Father would not return the child home to Germany on July 31, 2023 in accordance with the terms of both the 2022 Relocation Order and the German Consent Order.

30. The Father then appeared unannounced at the child's school in Germany on or about July 3, 2023 and took the child from the kindergarten. The kindergarten staff called the German police. The German police located and stopped the Father at the airport in Dusseldorf, Germany. Despite challenging the German consent order in Illinois, the Father presented the German police with a copy of the German consent order as verification that he was authorized to take the child to the United States.

31. A few days later, the Father then initiated cases against the Mother in the Illinois state court for injunctive relief, ex parte relief, declaratory relief and contempt, in which he sought sole custody of the child. *See, e.g.* Resp. Ex. 34 at pp. 12-22. The Father made it clear in the Illinois state court proceedings that he did not intend to return the child to Germany at the conclusion of his parenting time.

32. The Mother then, on July 18, 2023, submitted her Hague Convention Application for Return to the Central Authorities for the United States and Germany seeking the return of the child to Germany. The Mother filed her Verified Petition for Return of Child to Germany in this Court on August 1, 2023.

33. The Mother informed the Illinois state court of her Hague Convention application and her petition in this Court. The Illinois state court did not stay the custody merits case as required by Article 16 of the Hague Convention and international comity. Instead, despite having

received the State Department's Article 16 notification, and despite the Mother requesting that the Illinois state court stay its case as required by the treaty, the Illinois state court has proceeded with its case and entered an order against the Mother relating to the merits of the custody dispute.

34. The Father has not returned the child to Germany. Instead, he has retained the child in Illinois.

**B. The Child's Habitual Residence Is Germany.[1]**

35. The determination of a child's habitual residence in Hague Convention cases "presents a task for factfinding courts." *Monasky v. Taglieri*, 140 S.Ct. 719, 730 (2020) (citations omitted). The Supreme Court in *Monasky* explains as follows:

> A child's habitual residence presents what U.S. law types a "mixed question" of law and fact—albeit barely so. The inquiry begins with a legal question: What is the appropriate standard for habitual residence? Once the trial court correctly identifies the governing totality-of-the-circumstances standard, however, what remains for the court to do in applying that standard . . . is to answer a factual question: Was the child at home in the particular country at issue? The habitual-residence determination thus presents a task for factfinding courts, not appellate courts, and should be judged on appeal by a clear-error review standard deferential to the factfinding court.

*Id*. at 730 (internal quotations and citations omitted).

36. Considering the testimony and documentary evidence adduced at the evidentiary hearing, here under the totality-of-the-circumstances standard, as fully set forth above, this Court finds as a matter of fact that the habitual residence of the child was Germany at the time the child was retained in Illinois. *See* Section I (A) *supra*.

---

[1] The factual finding aspect of the habitual residence element is addressed here. The legal conclusions relating to habitual residence are addressed in Section III *infra*.

## III.    PROPOSED CONCLUSIONS OF LAW

### A.    Hague Convention Standards.

37.    The Hague Convention was adopted to address and discourage the problem of international unilateral action by one parent. *See Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014). Through the adoption of the Hague Convention, States Parties, including Germany and the United States, have sought "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble; *see also* Hague Convention, art. 1; ICARA § 9001; *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The intention of the treaty is "to secure the prompt return of children wrongfully removed or retained in any Contracting State . . . to ensure that rights of custody and access under the law of one Contracting State are effectively respected in the other Contracting States." *Hernandez v. Cardoso,* 844 F.3d 692, 694 (7th Cir. 2016) (citing *Abbott*, 560 U.S. at 7) (internal quotations omitted); *see also Martinez v. Cahue,* 826 F.3d 983, 989 (7th Cir. 2016). "To fulfill the latter purpose, it seeks 'to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction.'" *Martinez*, 826 F.3d at 989 (citing *Garcia v. Pinelo,* 808 F.3d 1158, 1162 (7th Cir. 2015); (quoting *Walker v. Walker,* 701 F.3d 1110, 1116 (7th Cir. 2012)). The primary purpose of the Hague Convention is "to restore the pre-abduction status quo." *Chafin v. Chafin*, 568 U.S. 165, 169-70 (2013).

38.    "The Convention's central operating feature is the return remedy." *Abbott,* 560 U.S. at 9; *see also Martinez,* 826 F.3d at 989. When there has been a wrongful [removal or] retention, the country to which the child has been removed generally must order the prompt return of the child. *Id.*

39.     The scope of a court's inquiry under the Hague Convention is limited to the merits of the claim for wrongful removal or retention. Hague Convention, art. 16, 19; ICARA § 9001(b)(4). The merits of any underlying custody case are therefore not at issue and cannot be considered. *See Walker*, 701 F.3d 1110, which is discussed in detail below. The return remedy therefore "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." *Lozano*, 572 U.S. at 5.

40.     The International Child Abduction Remedies Act ("ICARA") is the Convention's implementing legislation in the United States. It establishes straightforward procedures for the operation of the Hague Convention in the United States by defining and allocating burdens of proof for claims and discretionary exceptions under the Convention. ICARA § 9001 *et seq.* ICARA requires that a petitioner under the Hague Convention establish, by a preponderance of the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention." ICARA § 9003(e)(1)(A).

41.     In order to establish a prima facie case of wrongful retention under the Convention and ICARA, the Mother is to establish by a preponderance of the evidence that: (1) the habitual residence of the child at the time of the retention was Germany; (2) the retention breached the Mother's article 5*a* "rights of custody" under German law; and (3) the Mother was exercising "rights of custody" at the time of the retention or would have been so exercising her rights but for the retention Convention, art. 3. When the Mother establishes by a preponderance of the evidence that the Father's retention of the child is wrongful within the meaning of the Convention, the child's return is required forthwith pursuant to article 12 of the Convention, unless in its discretion the Court sustains one of the narrow exceptions to return.

42.     In analyzing Hague Convention cases, a court must answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention? *Abou-Haidar v. Sanin Vazquez,* 945 F.3d 1208, 1215 (D.C. Cir. 2019); *see also Redmond v. Redmond,* 724 F.3d 729, 737-38 (7th Cir. 2013).

**B.     The Date of Retention.**

43.     The Father retained the child in Illinois on or about July 7, 2023 when he unilaterally sought sole custody of the child, contrary to the German Consent Order, in the Illinois state court.

44.     "The circuits identify the date of retention as 'the date consent was revoked' or 'when the petitioning parent learned the true nature of the situation.'" *Abou-Haidar,* 945 F.3d at 1216 (quoting *Palencia v. Perez,* 921 F.3d 1333, 1342 (11th Cir. 2019)). The D.C. Circuit has explained that "for example . . . the date of retention is the date when the retaining parent advised the other that she would not be returning with the children as originally planned." *Abou-Haidar,* 945 F.3d at 1216 (citing *Marks ex rel. S.M. v. Hochhauser,* 876 F.3d 416, 422 (2nd Cir. 2017)) (internal quotations omitted). Similarly, the retention date is identified as "the date beyond which the noncustodial parent no longer consents to the child's continued habituation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Abou-Haidar,* 945 F.3d at 1216 (citing *Blackledge v. Blackledge,* 866 F.3d 169, 179 (3rd Cir. 2017)) (internal quotations omitted).

45.     Parental actions that serve to identify the retention date need not be formal. *Abou-Haidar,* 945 F.3d at 1216. But formal actions also qualify to establish a retention date, including unilaterally filing for custody. *Id.* (citations omitted).

46.     In *Abou-Haidar*, the mother, father and child lived together as a family in France. *Id.* at 1211-12. They came to the United States for a fixed period of time for the mother's temporary work assignment at the Inter-American Development Bank in Washington, D.C. The family's plan had been to return home to France at the conclusion of the mother's temporary assignment, on or about December 31, 2019. *Id.* But on May 7, 2019, the mother served the father with a complaint she had filed in the D.C. family court seeking sole custody of the child. *Id.* at 1212. On May 10, 2019, the mother informed the father that she did not intend to return the child to France at the end of the year. *Id.* And on May 31, 2019, the mother's family court counsel sent a letter to the father informing him that he was no longer welcome in the family's temporary apartment in D.C. *Id.*

47.     The father filed his Hague Convention petition on June 10, 2019 seeking the child's return to France. *Id.* The mother argued, *inter alia*, that the father's Hague petition was premature because the original return date of December 31, 2019 had not yet passed. *Id.* at 1216-18. Both the federal trial and appellate courts agreed with the father's position that a retention can be anticipatory. *Id.* The trial court held that the date of retention was, at the earliest, May 7, 2019 – the date the mother informed the father of her family court filing seeking sole custody. *Id.* at 1216. It further found that the latest possible retention date was May 23, 2019 – the date on which the father opposed the mother's requested change to the father's custody rights. *Id.*

48.     The appellate court affirmed the district court's analysis. Relying on the Seventh Circuit's *Redmond* case, the D.C. Circuit explained that "[g]iven the temporal concentration of these events and the lack of any material effect on the analysis of choosing one date over another,

we need not isolate one definitive act of retention. Under any circuit's existing law on the point, one or more of these actions suffices to identify a retention." *Abou-Haidar,* 945 F.3d at 1217 (citing *Redmond,* 724 F.3d at 739, n. 5). In *Redmond*, the Seventh Circuit recognized that an "'abduction' might have occurred on one of several dates; the question is always whether there was *any* date on which a wrongful removal or retention occurred." *Redmond,* 724 F.3d at 739, n. 5 (emphasis in original).

49.     The same analysis applies here. On May 31, 2023, the parties entered into a Consent Order in the German Court. The Consent Order reaffirms the provision of the 2022 Relocation Order providing that the child shall live with the Mother in Germany. And it sets a specific access schedule for the Father, which slightly modifies the Father's previous access schedule under the 2022 Relocation Order.  Under the German Consent Order's access schedule, the child was to be returned home to Germany on July 31, 2023.

50.     Almost immediately after entry of the German Consent Order, the Father began taking steps to retain the child in Illinois by attempting to "reassert custody rights" in the Illinois state court through the filing of various pleadings and papers seeking sole custody of the child. By way of example, on June 1, 2023, the Father filed his German Settlement Notice in the Illinois state court. The Father's notice contained only an incomplete translation of the German Consent Order. It did not contain the original German Consent Order, and did not advise the Illinois state court that the German Settlement was in fact a Consent Order entered by the German Court.

51.     The Father then immediately claimed he had been duped into entering the German Consent Order under duress. He made these claims as early as June 2, 2023 to the state court guardian ad litem, Mr. Bender, according to Mr. Bender's testimony before this Court.

52.     The Father then took the child from his kindergarten in Germany to Illinois on or about July 3, 2023. Just a few days after the Father arrived in Illinois with the child, he unilaterally filed for sole custody in the Illinois state court. It is uncontroverted based on the parties' trial testimony and exhibits that all throughout June and July of 2023, the Father sought sole custody and injunctive relief through various unilateral filings in the Illinois state court. By July 18, 2023 at the latest, the Mother had learned the true nature of the situation—that the Father would not be returning the child to Germany as required by the German Consent Order and that he instead would retain the child and seek sole custody in the Illinois state court.

53.     Here, as in *Abou-Haidar*, any one or more of the Father's actions suffices to identify a retention. A retention occurred as early as June 1, 2023, even before the child arrived in Illinois, when the Father failed to inform the Illinois state court that the settlement in Germany was in fact a Consent Order. Alternatively, a retention occurred: (A) on July 7, 2023 when the Father unilaterally sought custody in the Illinois state court; and/or (B) on July 18, 2023, the latest date on which the Mother had learned the true nature of the situation—that the Father would not be returning the child to Germany.

54.     Also as in *Abou-Haidar*, given the temporal concentration of the Father's actions, and the lack of any material effect on the analysis of choosing one date over another, the Court need not isolate one definitive act of retention to find that a retention occurred between June 1, 2023 at the earliest and July 18, 2023 at the latest. *See Redmond supra.*

**C.      The Child's Habitual Residence Was Germany on the Date of Retention.**

55.     In 2020, the Supreme Court issued its opinion in the *Monasky v. Taglieri* case, holding that ". . . a child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S. Ct. at 723. In so holding, the Supreme Court adopted a uniform

standard, based upon the standard that had been employed by the Seventh Circuit, which had rejected "rigid rules, formulas, or presumptions" in making habitual residence determinations. *Redmond*, 724 F.3d at 746. The totality of the circumstances analysis here leads to but one conclusion: the child's habitual residence is Germany, and was Germany immediately before the retention.

56.     In its discussion of habitual residence, the *Monasky* Court explained that in general, a child "resides where she lives." *Monasky*, 140 S. Ct. at 726. The term "habitual" suggests a fact-sensitive inquiry. *Id*. "Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id*. (citing *Redmond*, 724 F.3d at 744). The Supreme Court has instructed that no single fact is dispositive across all cases. *Id*.

57.     The drafting history of the Convention is instructive as to how a court analyzes the totality of the circumstances in making a habitual residence determination. *Monasky*, 140 S. Ct. at 727. The drafters intentionally chose the phrase "habitual residence" for its "factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality." *Id*. (citing Anton, 30 Int'l & Comp. L. Q. 537, 544 (1981) (history of the Convention authored by the drafting commission's chairman)). The Supreme Court explained that the drafter's choice is instructive because it indicates that the signatories "sought to afford the courts maximum flexibility to respond to the particular circumstances of each case." *Id*. (citations omitted). The Supreme Court then succinctly summarized the analysis stating "[t]he bottom line: there are no categorical requirements for establishing a child's habitual residence . . ." *Id*. at 728.

58.     Consistent with the required *Monasky* analysis, Article 17 of the Hague Convention expressly provides that "[t]he sole fact that a decision relating to custody has been given or is

entitled to recognition in the Requested State *shall not* be a ground for refusing to return a child under this Convention. Convention, art. 17 (emphasis added). The Hague Convention is a treaty and is the supreme law of the land. Under well-settled principles of law, this Court is therefore strictly bound by article 17 of the Hague Convention. Accordingly, this Court cannot deny the Mother's Hague Convention case on the sole basis that an order relating to custody exists in the Illinois state court. *Id*. Under article 17 of the Convention, a parent who wrongfully removes or retains a child cannot insulate the child from the Convention's return provisions by obtaining a state court custody order. United States Department of State Legal Analysis, 51 Fed. Reg. 10494, 10504-05. Nor can the retaining parent rely upon a stale state court order, the provisions of which have been derogated from subsequently by agreement or acquiescence, to prevent the child's return under the Convention. *Id.*

59.     Indeed, it is the Seventh Circuit that has decided the leading case on exactly this legal issue. *Walker*, 701 F.3d at 1116. The Seventh Circuit instructs in *Walker* that article 17 of the Hague Convention "qualifies the finality of any state-court custody judgment and thus ensures that there is still a live controversy before the federal court." *Id*.  It further instructs that when habitual residence is disputed in a Hague Convention case:

> Until that question is resolved, we cannot say which country's courts have the power to resolve the issue of custody. As Article 17 of the Convention implies, the antecedent question must be answered before we know what weight to give to the judgment of the Illinois court.

*Id*.

58.     The Seventh Circuit explains that this approach "makes sense, given the purpose of the Convention." *Id*. It explains that accepting a position whereby an abducting parent could "render a petition for return moot by racing to a courthouse in her chosen country to obtain a custody judgment would turn the Convention on its head." *Id*. The Seventh Circuit recognizes that

"[t]he entire purpose of the Convention is to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction." *Id*. (citations omitted). Considering a Hague Convention case moot based on the existence of any state court custody judgments would "encourage the very sort of jurisdictional gerrymandering the Convention was designed to prevent." *Id*. Existing custody orders may therefore be considered as a *factor* in the totality-of-the-circumstances habitual residence analysis; but they are not alone dispositive.

59.     The evidence adduced at the evidentiary hearing therefore establishes that this case is one of the straightforward habitual residence analyses anticipated by the *Monasky* Court. On May 9, 2022, the Illinois state court granted permission for the Mother and child to relocate to Germany. The Mother and child moved to Germany on or about May 13, 2022 in accordance with the Illinois state court's relocation ruling. *Id*. The Mother and child have lived together in Germany ever since. The child attends school in Germany and was again by express agreement of the parties to start the 2023-2024 school year in Germany on August 8, 2023. The child receives routine medical care, mental health care, and dental care in Germany. Indeed, the Father's sister, Philtrina Farquharson, testified at the evidentiary hearing that she had visited the child in Germany, inspected his German school materials, visited his school, and even took the child to hospital in Germany when he became ill during their visit. The child has friends and family in Germany and attends play dates and extracurricular activities in Germany. The child speaks German fluently and is fully involved and integrated in all aspects of daily and cultural life in Germany.

60.     In May 2023, the parties engaged in settlement negotiations in the German proceedings pending in the German court. The German proceedings and settlement negotiations were initiated as a result of the Father having refused to provide the child's passport to the Mother

in January 2023 as required by the 2022 Illinois relocation order. At a hearing scheduled in the German case on May 31, 2023, the parties each appeared (the Father appeared by video) and were each represented by German counsel. The German Youth Welfare Office worker attended the hearing. The German Court provided a certified English-German interpreter for the Father. At the appearance before the German Court, the parties through their respective counsel reach an agreement with respect to the child's living arrangements and schedule. The parties and their respective counsel engaged in settlement negotiations over a four-hour time period at the German Court appearance. In reaching their agreement, the parties each had the opportunity to speak privately with their respective counsel all throughout the day.

61.     The Mother and Father agreed that the child was to continue to live in Germany with the Mother. *Id.* They further agreed that for the summer holidays of 2023, the child would visit with the Father in Illinois and would return home to Germany on July 31, 2023, in time to begin the new school year on August 8, 2023. The parties entered their agreement as a Consent Order in the German court that day.

62.     The testimony and documentary evidence, considered here under the totality-of-the-circumstances standard, establish as a matter of fact that the habitual residence of the child was Germany at the time the Father retained the child in Illinois.

**D.      Rights of Custody to the Child Under German Law.**

63.     After determining the child's habitual residence, the Court next considers the "rights of custody" to the child at the time of the retention. Whether a petitioner has article 5*a* "rights of custody" to a child is determined based upon the law of the child's habitual residence— here, under German law. Under the Convention, "removal or retention of a child is deemed wrongful when it is in breach of rights of custody attributed to a person, an institution or any other

body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal." Convention, art. 3*a*. "Rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5.

64.     In considering whether a party has "rights of custody" the Court may "take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to specific procedures for the proof of that law or for the recognition of foreign decision which would otherwise be applicable." Convention, art. 14; *see also* FRCP 44.1. The Court may consider affidavits of foreign law to establish rights of custody. *Whallon v. Lynn, 230* F.3d 450, 455 (1st Cir. 2000).

65.     The Mother filed two Affidavits of German Law executed by Dr. Andreas Hanke, an attorney licensed to practice law in Germany to establish her "rights of custody." Pet. Exs. 1, 2. Dr. Hanke also testified at the evidentiary hearing. Dr. Hanke's affidavits and testimony are uncontroverted. In his affidavits and his testimony, Dr. Hanke confirmed that the May 31, 2023 Consent Order confers joint rights of custody on the Mother under German law. Dr. Hanke further confirmed in his testimony that the May 31, 2023 German Consent Order has not been vacated, stayed or modified in any way in Germany. He confirmed that the Father never challenged the German Court's authority or jurisdiction to enter the Consent Order, and that the Father never appealed the German Consent Order. He confirmed that the German Consent Order has remained in effect from the date it was entered on May 31, 2023 through the present. It was therefore in effect all throughout June and July of 2023, and remains in effect today. The German Consent Order was therefore in effect at the time the Father retained the child in Illinois. It is a breach of

the Mother's rights of custody under the German Consent Order for the Father to retain the child in Illinois.

**E.      Exercising Rights of Custody.**

66.      The final element of the Mother's *prima facie* case is that the "rights of custody" were being exercised by the Mother immediately prior to the retention, or would have been exercised but for the retention. "Rights of custody" are only to be considered not exercised by a petitioner if the child has been abandoned. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004). No such evidence was adduced because there has been no such abandonment here. The Mother has never abandoned the child.

67.      A preponderance of the evidence therefore establishes all three elements required under the Hague Convention to establish that the Father has wrongfully retained the child in the United States from Germany. The Convention therefore requires that the child be returned to Germany forthwith. Convention, art. 12. The child shall be returned to Germany forthwith, and a separate Return Order will be entered for the child's return.

**F.      None of the Convention's Narrow Discretionary Exceptions to Return Applies.**

68.      There are certain narrow discretionary exceptions to return under the Convention, that allow a court in its discretion to decline to return a child even when a petitioner has met its burden of establishing a wrongful removal by a preponderance of the evidence. *See* Convention arts. 13 and 20. None of these discretionary exceptions applies here.

69.      The only exception the Father attempted to assert is the Convention's article 13*b* exception. When a respondent "demonstrates by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation, the automatic return required by the Convention should

not go forward." *Norinder v. Fuentes,* 657 F.3d 526, 534 (7th Cir. 2011). The Father has the burden to prove the grave risk exception by clear and convincing evidence. ICARA § 9001(a)(4). In the Seventh Circuit, "[e]vidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *In re Myers,* 616 F.3d 626, 631 (7th Cir. 2010) (quoting *Davis v. Combs,* 294 F.3d 931, 936-37 (7th Cir. 2002)) (internal quotations omitted). There is a therefore a high bar required in the Seventh Circuit for a respondent to meet its burden on the article 13*b* exception. The article 13*b* exception must be interpreted narrowly, lest it swallow the rule. *Norinder,* 657 F.3d. at 545.

70.     There was no evidence whatsoever adduced at trial to support the Father's 13*b* claim.  Rather, the evidence adduced at trial demonstrated that the child is in no danger at all if returned to Germany. The child is well-cared for by the Mother. The German Court is involved in the family. And the Father's claims of violence against him are nonsensical – it was the Father who perpetrated domestic violence against the Mother for years, for which he has been criminally convicted after trial, which was affirmed on appeal. The Mother testified that she used pepper spray once to defend herself against a violent attack by the Father.

71.     There is no grave risk in returning the child to Germany. The Mother's Petition for Return of Child to Germany should be granted and the child returned to Germany forthwith in accordance with the Court's separately entered Return Order.

## IV.     CONCLUSION

72.     The child's home is in Germany. The Mother has met her *prima facie* burden on her Hague Convention claim. None of the discretionary defenses applies. The child shall therefore be returned forthwith to Germany.

Respectfully Submitted,

/s/ Kelly A. Powers
Stephen J. Cullen
Kelly A. Powers
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of November, 2023, a copy of the foregoing Proposed Findings of Fact and Conclusions of Law was electronically filed, and that it is available for viewing and downloading from the ECF system to all counsel of record, and that it has been emailed to the pro se Respondent.

/s/ Kelly A. Powers
Kelly A. Powers