IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Asli Baz,

        Petitioner,

   v.

Anthony Patterson,

        Respondent.

Case No. 23 C 5017

Judge Jorge L. Alonso

## Memorandum Opinion and Order

Before the Court is Petitioner Asli Baz's petition for return of the parties' child, A.P., to Germany. For the below reasons, the Court grants the petition and orders Respondent Anthony Patterson to return A.P. to Germany forthwith.

## Findings of Fact

The Court makes the following findings of fact following a two-day evidentiary hearing, which included witness testimony, documentary evidence, and the parties' arguments.

While visiting Florida from the United Kingdom, Baz met Patterson, who at that time lived in Miami, and they then began a relationship in approximately 2013. In 2015, Baz moved to Chicago on a student visa to pursue a doctoral degree in clinical psychology, and the parties moved in together. They did not marry, and had a son, A.P., who was born in 2017. Shortly after, the parties separated, and lived on different floors of their home with A.P. pursuant to an Illinois state court custody order. On November 24, 2017, Patterson committed a domestic battery against Baz, for which he was later charged and convicted. (*See* Pet. Ex. 8.)

For several years, the parties litigated custody and other issues related to A.P. in the Circuit Court of Cook County, Illinois (the "Illinois state court"). On August 5, 2019, that court

allowed Baz to relocate with A.P. to Wisconsin for her pre-doctoral internship. On September 2, 2020, the court allowed her to relocate with A.P. to Minnesota for her post-doctoral fellowship. Patterson remained in Chicago, and A.P. would split his time between the parties.

Baz completed her post-doctoral fellowship in 2021, and her student visa was set to expire in May 2022. After failing to obtain employment or another basis to lawfully remain in the United States, Baz sought permission from the Illinois state court to relocate with A.P. to Germany. The court granted Baz's request over Patterson's objection and the recommendation of the guardian ad litem, Michael Bender.

On May 23, 2022, the Illinois state court entered the parties' proposed consent order related to the relocation, titled "Allocation Judgment: Allocation of Parental Responsibilities and Parenting Plan" (the "Allocation Judgment"). (Pet. Ex. 7.) Among other things, the Allocation Judgment provided that Patterson would have parenting time with A.P. during summer and other school breaks, and could visit A.P. in Germany, but otherwise A.P. would spend his time with Baz. (*Id.* art. 3.01.) The parties could modify this arrangement by written agreement. (*Id.* art. 3.01(G).[1]) Patterson also was allowed daily video calls with A.P., and Baz was to "continue to make efforts towards applying for temporary or permanent Visas that enable her to travel to and from the United States." (*Id.* arts. 3.01(G), 3.03.) Under the Allocation Judgment, A.P. would attend school in Dusseldorf, Germany, with each parent paying half the tuition fee. (*Id.* arts. 1.04, 4.3(a).) Each parent was to maintain physical possession of A.P.'s United States passport during their respective parenting time, and the parents were to exchange the passport during pick-up/drop-off periods. (*Id.* art. 3.05(D).) The parents also agreed that, specifically with respect to

---

[1] The Allocation Judgment erroneously contains two successive articles 3.01(G)—this citation refers to the second such article of the Allocation Judgment, titled "Modification."

the Hague Convention, "[t]he 'Habitual Residence' of the minor child is the United States of America, specifically the County of Cook, State of Illinois, United States of America," and that they had not "consented, or acquiesced to the permanent removal of the child to or retention in any country other than the United States of America." (*Id.* arts. VI, VI(D).) The Allocation Judgment also stated, "So long as at least one parent resides in the State of Illinois, the Circuit Court of the State of Illinois shall retain exclusive and continuing jurisdiction over this cause to enforce or modify the terms and provisions of this Allocation Judgment." (*Id.* art. 7.05.) Baz's move to Germany was intended to be temporary while she sought to return to the United States, though the Allocation Judgment did not provide a termination date. (*See* Pet. Ex. 7, art. 3.01(B) (detailing parenting time for 2022–23 and indefinite future years).)

Based on the Allocation Judgment, and after getting rid of most of her belongings in the United States, Baz and A.P. relocated to Germany on approximately May 13, 2022. Baz currently lives in Erkrath, Germany. Prior to this, A.P. had attended school in Chicago during his parenting time with Patterson and participated in extracurricular activities including soccer, swimming, art classes, and gymnastics. A.P. also has siblings who live in Chicago and extended family elsewhere in the United States.

A.P. attended kindergarten at the International School on the Rhine in Dusseldorf from August 2022 until December 2022, then attended Johanniter Kindergarten in Erkrath, Germany from January 2023 until July 2023. A.P. was then enrolled and scheduled to begin first grade on August 8, 2023, at Regenbogen Grundschule Primary School in Erkrath, Germany. Patterson has visited A.P. while A.P. is in Germany and has exercised parenting time in the United States.

A.P. is fluent in English, German, and Turkish and has extended family and friends in Germany. In addition to his German schooling, A.P. has participated in swim classes and has a German pediatrician, dentist, and therapist—all of which are conducted in German.

At the conclusion of his parenting time with A.P. on January 5, 2023, Patterson did not return A.P.'s United States passport to Baz. In response, Baz first sought the help of German police to obtain A.P.'s passport, then filed a legal case in Germany seeking an order preventing A.P. from being removed from Germany and a custody order. The German court entered interim orders prohibiting A.P.'s removal from Germany. Patterson retained German counsel, who represented him during those proceedings.

In March 2023, Patterson filed with the Illinois state court an "Emergency Motion to Modify Parenting Time and Allocation of Parental Responsibilities and Parenting Time," which the Court deemed not an emergency and continued. (Resp. Exs. 7, 26.) In April 2023, the Illinois state court granted Baz's attorney leave to withdraw in that state case and ordered Baz to file a supplemental appearance. (Resp. Ex. 7.) To date, she has not done so.

On May 31, 2023, the parties and their counsels negotiated a settlement in the German proceedings and reached an agreement, memorialized in a "Consent Order" signed that day. (Pet. Ex. 4.) Pursuant to the Consent Order, and among other things, the parties agreed that A.P. "is currently living in Germany with the Child's Mother," but Patterson "is authorized and required to have parenting time or contact with [A.P.] during the period from 06/19/2023 through 07/31/2023" and "commits himself to return [A.P.] to Germany after the end of his parenting time." (*Id.* at AB000411–12.) They agreed that Patterson was allowed other discrete contact time with A.P. in Germany in August 2023, and that Patterson would keep A.P.'s American passport and Baz would keep A.P.'s German passport. (*Id.* at AB000412.) The parties also were "in

4

agreement that the custody related matters pertaining to [A.P.] . . . in the USA and in Germany will not currently be pursued further in view of the interim settlement." (*Id.*) Patterson also committed himself "to submit the settlement . . . to the court in Chicago," and "to request that the American court suspend the proceedings in view of the fact that the German attorneys want to come up with an out-of-court solution." (*Id.* at AB000413.) The parties otherwise agreed "that the court settlement from the Circuit Court of Cook County, Illinois, from 05/23/2022 should continue to apply," referring to the Allocation Judgment. (*Id.* at AB000411; *see also id.* at AB000412 ("As long as no further specifications have been adopted, the rules in the settlement from 05/23/2022 shall remain in place.").) On June 1, 2023, Patterson notified the Illinois state court of the parties' agreement.

However, Patterson then immediately claimed to the guardian ad litem in the Illinois state case, Michael Bender, that he had agreed to the Consent Order under duress.[2] At some point, Patterson filed an "Emergency Motion to Modify Parenting Time and Allocation of Parental Responsibilities and Parenting Plan and Petition for Rule to Show Cause and for a Finding of Indirect Civil Contempt"[3] before the state court, and appears to have pursued that motion notwithstanding his commitment to request that the proceedings be suspended under the Consent Order.[4] (*See* Resp. Exs. 18, 26.[5]) In light of Patterson's actions, Baz believed that Patterson

---

[2] The Court does not find that Mr. Patterson was under duress at that time—he was represented by retained counsel, voluntarily participated in the May 31, 2023, settlement proceedings, and presented no evidence that he signed the Consent Order under duress.
[3] This motion likely was the same as or related to Patterson's "Emergency Motion to Modify Parenting Time and Allocation of Parental Responsibilities and Parenting Time," filed in March 2023. (*See* Exs. 7, 26.)
[4] The Court was not provided with a copy of the motion itself.
[5] There was some confusion at the evidentiary hearing regarding the proper numbering for Patterson's exhibits. For clarity and consistency, the Court applies the exhibit numbering of the tabbed binder of Patterson's exhibits that was submitted to the Court and reflects the exhibits in the order they were exchanged by Patterson to Baz's counsel on October 31, 2023. This may not

5

would not return A.P. following his summer 2023 parenting time. Accordingly, she did not send A.P. to the United States on June 19, 2023, as required by the Consent Order and Allocation Judgment.

On June 27, 2023, the state court considered Patterson's "Emergency Motion to Enforce the May 23, 2022 Court Order and to Modify Parental Responsibilities and Parenting Plan." (Resp. Ex. 20.) It found that Baz had not turned A.P. over to Patterson on June 1, 2023—though the Consent Order had revised the exchange date to June 19, 2023, which likewise had passed—ordered Baz to turn over A.P. to Patterson immediately, and authorized Patterson to travel to Germany to retrieve A.P. (*Id.*)

Patterson travelled to Germany, and on July 3, 2023, he arrived at A.P.'s kindergarten and took A.P. with him. The kindergarten staff called the German police, who stopped Patterson at the Dusseldorf airport but ultimately allowed him to leave with A.P. because the Consent Order confirmed that Patterson was within his summer parenting time.

Sometime around July 7, 2023, Patterson appears to have filed an "Emergency Ex Parte Petition for Temporary Restraining Order and Preliminary Injunction," requesting that Baz be ordered to return A.P. to Chicago and requesting sole custody.[6]

On July 18, 2023, Baz filed a Hague Convention Application for Return to the Central Authorities for the United States and Germany, seeking the return of A.P. to Germany. On August

---

always correspond with the numbers used for Respondent's exhibits during the evidentiary hearing.

[6] The Court has not been provided with a copy of this petition, and Patterson disputes that he requested sole custody. However, the Illinois state court did grant the petition and awarded Patterson exclusive parenting time on July 10, 2023.

1, 2023, she filed her pending Verified Petition for Return of Child to Germany in this Court.[7] (ECF No. 1.)

On July 25, 2023, the Illinois state court converted its temporary restraining order against Baz into a preliminary injunction. Despite Baz's request, the Illinois state court has not stayed its custody case and has kept its preliminary injunction in effect. (Resp. Ex. 41.) Since then, Patterson has not allowed A.P. to return to Germany.

On November 20 and 27, 2023, the Court held an evidentiary hearing, during which the parties presented witness testimony, documentary evidence, and arguments to support their respective positions. Following the hearing, each side submitted proposed findings of fact and conclusions of law, which the Court has considered.[8]

## Conclusions of Law

The Hague Convention, to which both the United States and Germany are signatories,[9] is designed "to address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (internal quotation marks and citation omitted). The Convention "ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides," with certain exceptions. *Id.* "The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody

---

[7] The Court is aware that the Hague Convention envisions a six-week timeline to adjudicate Hague cases. Hague Convention art. 11. Unfortunately, that timeline was not feasible in this case due to the parties' schedules.
[8] This includes Patterson's submission, a physical copy of which was filed with the Court on December 8, 2023.
[9] *See* Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

proceedings." *Id.* (citation omitted). In the United States, the Hague Convention is implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*

"The central question in any petition seeking the return of a child under the Hague Convention and ICARA is whether the child who is the subject of the petition has been 'wrongfully' removed or retained within the meaning of the Convention." *Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013). "[A] removal or retention is wrongful where (a) 'it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State (b) in which the child was habitually resident immediately before the removal or retention'; and (c) 'at the time of removal or retention[,] those rights were actually exercised . . . or would have been so exercised but for the removal or retention." *Torres v. Tovar*, No. 22-cv-3806, 2023 WL 5431352, at *5 (N.D. Ill. Aug. 23, 2023) (quoting Hague Conv. art. 3). The petitioner must prove these elements by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1). If she does so, the burden shifts to the respondent to show that an exception applies, including an affirmative defense of grave risk of harm under Article 13(b) by clear and convincing evidence. 22 U.S.C. § 9003(e)(2).

A court thus asks four questions to determine whether a removal or retention was wrongful: "(1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?" *Redmond*, 724 F.3d at 737. The Court now turns to those questions.

8

1. **Date of Retention**

   Baz argues that Patterson retained A.P. on three possible dates:

   1) June 2, 2023, when Patterson told the guardian ad litem in the Illinois state case that he had agreed to the German Consent Order under duress;

   2) July 7, 2023, when Patterson purportedly requested sole custody of A.P. in Illinois state court; or

   3) July 18, 2023, when Baz filed her Hague Convention Application seeking A.P.'s return.

Patterson counters that no retention occurred on any date.

The Court concludes that July 7, 2023 is the proper date of Patterson's retention of A.P. for purposes of its Hague Convention analysis. "Wrongful retentions typically occur when a parent takes a child abroad promising to return with the child and then reneges on that promise[.]" *Redmond*, 724 F.3d at 738 n.5. As other circuits have found, this is "'the date consent was revoked' or 'when the petitioning parent learned the true nature of the situation.'" *Abou-Haidar v. Sanin Vazquez*, 945 F.3d 1208, 1216 (D.C. Cir. 2019) (quoting *Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019)). On July 3, 2023, Patterson took A.P. to the United States after invoking his parenting time and getting permission from the Illinois state court to do so. But on or around July 7, 2023, Patterson appears to have sought sole custody of A.P. in Illinois state court, thus indicating his refusal to abide by the parties' Consent Order and that he would not be returning A.P. to Germany at the end of the month (as indeed he did not). The Court thus considers July 7, 2023, as the date of Patterson's retention of A.P. to ground its analysis—though its conclusions below as to Baz's Hague Convention petition would be the same for any of the other proposed retention dates in June–July 2023, including when Patterson refused to return A.P.

9

after July 31, 2023 (the last date of Patterson's parenting time under the Consent Order). *See Abou-Haidar*, 945 F.3d at 1217 ("Given the temporal concentration of these events and the lack of any material effect on the analysis of choosing one date over another, we need not isolate one definitive act of retention. . . . [O]ne or more of these actions suffices to identify a retention.").

2. **Habitual Residence**

"The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 140 S. Ct. at 726. This requires a "fact-driven inquiry," and courts "must be 'sensitive to the unique circumstances of the case and informed common sense.'" *Id.* at 727 (quoting *Redmond*, 724 F.3d at 744). "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Id.*; *see also id.* at 727 n.3 (listing factors, including a change in geography combined with the passage of an appreciable period of time, age of the child, academic activities, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, and language proficiency). The parents' intentions are "relevant considerations" too. *Id.* at 727. "No single fact, however, is dispositive across all cases." *Id.*

Here, certain facts weigh against Baz. Most notably, the parties explicitly agreed in the May 23, 2022, Allocation Judgment that A.P.'s habitual residence of the minor child was the United States of America. (Pet. Ex. 7, art. VI.) As this Court already recognized, the Allocation Judgment purported to determine A.P.'s habitual residence as of May 23, 2022—not as of the date of retention, July 7, 2023. (ECF No. 24 at 5.) But the parties then appeared to reaffirm A.P.'s United States residence when they reiterated in their May 31, 2023, Consent Order that the provisions of the Allocation Judgment largely remained in place except for certain carveouts—

10

evidently agreeing that the United States remained A.P.'s habitual residence at that time too. (*See* Pet. Ex. 4 at AB000411–12.) The parties' shared intentions are relevant to determining habitual residence, and the parties' arguably mutual agreement that A.P.'s habitual residence was the United States as of May 31, 2023, weighs in favor of concluding that the United States remained A.P.'s habitual residence on July 7, 2023, just over one month later. *See Hulsh v. Hulsh*, No. 19 C 7298, 2020 WL 11401634, at *7 (N.D. Ill. July 21, 2020) ("Parents' intentions and circumstances pertaining to the parents . . . are relevant considerations[.]")

Still, in *Monasky*, the Supreme Court rejected the view that the parties' shared intentions control the habitual-residence inquiry, and pointed to foreign decisions finding that "the purposes and intentions of the parents [are] merely one of the relevant factors." *Monasky*, 140 S. Ct. at 728–29. It therefore concluded "that the determination of habitual residence does not turn on the existence of an actual agreement." *Id.* at 726. Thus, even if the parents agreed in May 2022 and again in May 2023 that the United States was A.P.'s habitual residence as of those dates, that is but one factor. The Court considers the totality of the circumstances to determine whether A.P. was at home in Germany when Patterson retained him in July 2023.

Any agreement reflected in the Allocation Judgment and Consent Order as to A.P.'s habitual residence is outweighed by the evidence of A.P.'s acclimation in Germany and other factors that establish Germany as A.P.'s habitual residence. *See Martinez v. Cahue*, 826 F.3d 983, 992 (7th Cir. 2016) (concluding that Mexico was a child's habitual residence where, among other things, "[w]hile A.M. had spent most of his life in Illinois, that fact is not dispositive. . . . By the end of his first year in Mexico, he displayed all of the indicia of habitual residence, including friends, extended family, success in school, and participating in community and religious activities."). As Baz testified at the hearing, and Patterson did not meaningfully challenge, A.P.

11

had been attending kindergarten and was enrolled in school in Germany, participated in extracurricular activities in Germany, and was fluent in German—which was the language in which his schooling, extracurriculars, and medical services were conducted. The Allocation Judgment also does not set a deadline for A.P.'s presence in Germany, even to the extent that Baz committed to continue seeking immigration authorization to return to the United States. It is little surprise, then, that after A.P. spent many months in Germany with Baz, attended school and other activities there, and did not return to the United States except during school breaks, and the parties had no definitive plans for A.P. to return permanently to the United States, Germany would have become A.P.'s habitual residence under the Hague Convention notwithstanding A.P.'s prior United States residence. *See Monasky*, 140 S. Ct. at 727 ("locating a child's home is a fact-driven inquiry"); *see also Koch v. Koch*, 450 F.3d 703, 715 (7th Cir. 2006) ("The establishment of a habitual residence requires an actual change in geography, as well as the passage of an appreciable amount of time. . . . [S]hared intent to someday return to a prior place of residence does not answer the primary question of whether the residence was effectively abandoned and a new residence established[.]"); *Garcia v. Pinelo*, 122 F. Supp. 3d 765, 776 (N.D. Ill. 2015) ("Even a temporary move can effectuate a change of a child's habitual residence."); *Capalungan v. Lee*, No. 2:18-cv-1276, 2019 WL 3072139, *4 (S.D. Ohio July 15, 2019) ("Ten months is a considerable amount of time to form bonds with family and friends considering [the child] was only five years old."). Indeed, the parties acknowledged in the Consent Order that, as of May 2023, A.P. was "currently living in Germany" with Baz. (Pet. Ex. 4 at AB000411.) The Court therefore concludes that based on the totality of the circumstances and the evidence presented, A.P.'s habitual residence as of the date of retention was Germany.

3. **Custody Rights**

A retention is wrongful under the Hague Convention only if it violates the petitioner's "rights of custody," which "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbot v. Abbott*, 560 U.S. 1, 9 (2010). Because Germany is A.P.'s habitual residence, the Court considers that issue under German law. *See Norinder v. Fuentes*, 657 F.3d 526, 533 (7th Cir. 2011). Here, Baz had custody rights under German law. The parties' Consent Order stated "that joint parental care and custody shall currently remain in place," and Dr. Hanke, Baz's German lawyer and expert, testified before and during that Baz had joint custody rights under German law. (Pet. Ex. 4 at AB000411; *see also* Pet. Exs. 1, 2.) Patterson presented no opposing expert or argument disputing this interpretation of German law or indicating that because Patterson was authorized under the parties' Consent Order and the Illinois state court's later orders to keep A.P. in the United States, Baz lacked custody rights for purposes of the Hague Convention.

Next, the Court considers whether Baz was exercising her custody rights at the time of Patterson's retention of A.P. "The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child," and "a person cannot fail to exercise his custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012) (internal quotation marks and citations omitted). Here, Baz plainly was exercising her custody rights at the time of Patterson's retention—she was able to stay in regular contact with A.P., and there is no evidence that Baz failed to do so or abandoned A.P. (*See* Pet. Ex. 7, art. 3.03.)

Baz thus has shown a *prima facie* case of wrongful retention under the Hague Convention. The Court now turns to Respondent's affirmative defense.

### 4. Affirmative Defenses

In his answer, Patterson pled an affirmative defense under Article 13(b) of the Hague Convention, claiming that returning A.P. to Germany would create a grave risk of harm to A.P. or place A.P. in an intolerable situation. (*See* ECF No. 33 at 26–27.) Patterson presented no evidence or argument of grave risk during or after the evidentiary hearing and certainly has not supported this affirmative defense by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2)(A). The Court accordingly finds that Baz has shown a *prima facie* case under the Hague Convention, Patterson has not established an affirmative defense, and thus A.P. must be returned to Germany.

To be clear, the Court's decision in this case is not a custody determination, and A.P. might ultimately return to the United States based on the parties' custody proceedings.[10] But this Court's task has been to decide only whether Patterson wrongfully retained A.P. outside of A.P.'s habitual residence on July 7, 2023, under the Hague Convention—and it concludes that he did. The Court thus must order the return of A.P. to Germany forthwith. *See* Hague Conv. art. 12.

### Conclusion

The Court grants Baz's petition for return of A.P. to Germany (ECF No. 1) and orders Patterson to return A.P. to Germany. The Court directs the parties to confer and cooperate

---

[10] The Allocation Judgment specifically provides that the Illinois state court, which has been the parties' agreed chief forum for their custody disputes, and to which the German courts have deferred, shall have "exclusive and continuing jurisdiction" over the parties' custody proceedings. (Pet. Ex. 7, art. 7.05.) That court found in July 2023 that Baz "has exhibited extremely concerning behavior as to direct violations of the [Allocation Judgment]" and "has shown utter disregard to the orders entered in this Court," and has granted Patterson sole custody of A.P. (Resp. Ex. 17.)

14

regarding reasonable arrangements for promptly returning A.P. to Germany.[11] The Clerk of the Court shall release A.P.'s German passport to Baz and A.P.'s United States passport to Patterson. Civil case terminated.

**SO ORDERED.**                                                      ENTERED: December 13, 2023

_____
**HON. JORGE ALONSO**
**United States District Judge**

---

[11] The Court is aware that Baz will be leaving the United States for Germany on December 15, 2023. The parties shall make reasonable efforts to allow A.P. to accompany Baz on that trip.